UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | |
|---|---|
| TIFFANY WHITSETT, )<br>)<br>    *Plaintiff*, )<br>)<br>v. )<br>)<br>CITY OF ETOWAH, MCMINN )<br>COUNTY, TENNESSEE, SCOTT )<br>ERWIN, individually and JOY PHILLIPS )<br>individually, JOHN DOE, an )<br>unidentified officer of the Etowah )<br>Police Department, )<br>)<br>    *Defendants.* ) | No.1:07-cv-117<br>*Edgar / Lee* |

**MEMORANDUM**

Plaintiff Tiffany Whitsett brings this civil rights action against the City of Etowah ("Etowah"), McMinn County, Tennessee ("McMinn County"), Scott Erwin, in his individual capacity, Joy Phillips, in her individual capacity, and John Doe, an unidentified officer in the Etowah Police Department (collectively "Defendants"). Ms. Whitsett claims that Defendants violated her Fourth and Fourteenth Amendment rights under the U.S. Constitution and brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983"). Ms. Whitsett also brings claims against Officers Erwin and Phillips under state law for the tort of outrageous conduct. She further asserts that Officer Phillips committed an assault and battery against her in violation of Tenn. Code Ann. § 40-7-121. In addition, she brings a claim of intentional infliction of emotional distress against all Defendants. Ms. Whitsett claims that, to the extent the individual officers' conduct was negligent, Etowah and McMinn County are liable for their actions. Plaintiff seeks compensatory and punitive damages, as well as attorneys' fees and costs.

Defendant Etowah moves for summary judgment dismissal of Plaintiff's claims against

it. [Court Doc. No. 42]. Plaintiff opposes the motion. [Court Doc. No. 43]. This court has reviewed the arguments of the parties, the record and the pertinent case law and has determined that Etowah's motion will be **GRANTED**.

**I.     Background**

The parties dispute the material facts in this matter. Because Defendants have moved for summary judgment, this court must view the facts in the light most favorable to the Plaintiff. Thus, the facts outlined below are Plaintiff's version of the events.

Plaintiff claims that on the night of June 19, 2006 she was riding home from her work as a waitress in Delano, Tennessee with a co-worker named Virginia Lee Martin. [Court Doc. No. 42-2, Deposition of Tiffany Whitsett ("Whitsett Dep."), p. 14, 78-79]. Plaintiff estimates that around 10:45 p.m. a police car pulled Ms. Martin over into the parking lot of a church about a quarter of a mile away from Plaintiff's home. *Id.* at pp. 82-85. At that point Ms. Martin informed Plaintiff that her driver's license had been suspended. *Id.* at pp. 86. Two Etowah police officers, Officer Erwin and Officer Chuck Nelms got out of the police car. Officer Erwin approached the driver's side of the vehicle, and Officer Nelms, with whom the Plaintiff was acquainted, approached the passenger side of the vehicle. *Id.* at pp. 89-91. Officer Erwin asked Ms. Martin to step out of her car, and he asked Officer Nelms to get Plaintiff out of the car as well. Plaintiff claims that "then they wanted to search me, and I let them. I emptied my pockets, and [Officer Nelms] had me pull my bra out and shake to make sure I had nothing in my bra." *Id.* at p. 91. Then Officer Erwin asked Plaintiff to repeat the same actions for him. *Id.* The officers then placed Plaintiff into the back of their police car. Sometime after this point, Ms. Martin's son, an off-duty police officer for the City of Englewood, arrived on the scene. *Id.* at p.

92; [Court Doc. No. 42-5, Deposition of Joy Phillips ("Phillips Dep."), p. 34].  The Etowah officers called in assistance from a female officer with McMinn County to conduct a search on Plaintiff in conjunction with the traffic stop.  *See* Phillips Dep., p. 29-31.

Plaintiff describes what followed:

> Then Chuck Nelms came back over to the car and the window was down already in the car, and he asked if I had anything on me to tell him now because they were getting a woman police officer up there to do a more thorough search. And I said, "I have an empty pill bottle with a paper sailboat in it." I got it out of my waistband, and when I held it up, he just immediately changed. He jerked me out of the car and put me in handcuffs.
> . . . And [Officer Erwin] was standing there with him, but they did that. It was just completely different after that. He emptied the pill bottle and it had a paper sailboat in it that a customer made me. I didn't want it crushed or wet or bent in my waitress apron. That's why it was in the bottle. And they put me back in the police car and kept screaming stuff at me. I don't know what it was, but by then another cop car had pulled up.
> I waited in the car I don't know how long. It seemed like a long time. I was in handcuffs. It seemed like forever. [Officer Phillips] got there and she got me out of the police car and took me over to her car which was still in front of everybody, all the officers that were standing there. There was Caleb. Caleb had got there in a jeep. He wasn't even in a cop car, and he had a friend with him, and they were both out of uniform.
> And she had me standing there and she took my shoes off and asked me if I had anything on me. And I said, "No, I don't have anything." And right then I started getting scared when she started taking my shoes off and asked me to undo my pants and I was standing out in front of everybody, the guys and houses and stuff. And she took my pants down to my knees. She left my underwear up, but she put her hands down the back of my pants and in my body and then down the front. And then she pulled my shirt up to right here and pulled my bra out and was feeling me there, and I was screaming at her no before she–when she had my pants down. And I was trying to bend down and cover myself, and I was screaming no. And she said for the guys to turn around, and I heard one of them say–she said, "Turn around: she's embarrassed." And I heard one of them say, "No. Let her be embarrassed."
> After she got done searching me, she pulled my pants up and buttoned them and put my shoes back on. And she said, "She's fine." And then I walked home.

Whitsett Dep., pp. 91-93.  Plaintiff contends that Officer Phillips subjected her to a strip search

and a search of her body cavities, including her vagina and anus. Officer Phillips contends that she did not conduct either a strip search or a body cavity search; however, as noted *supra*, this court must construe the facts in the light most favorable to the Plaintiff. Plaintiff further alleges that the search occurred in plain view of the other officers present, as well as the public street. She estimates that the strip search took as long as 7 or 8 minutes. Whitsett Dep., p. 117.

Plaintiff insists that the prescription bottle she pulled from her waistband while in the back seat of the police vehicle contained only a paper sailboat and did not have a label on it. Whitsett Dep., p. 95. Following Officer Phillips' search, Plaintiff was allowed to walk home.

Plaintiff does not submit evidence indicating that Etowah officers had a policy, custom, or practice of submitting passengers of vehicles subject to a traffic stop to unlawful strip searches or body cavity searches. Plaintiff presents no evidence that Etowah had a policy of subjecting any individuals to strip searches or body cavity searches. Etowah presents evidence regarding its policies relating to searches through its former chief of police, June Parham. [Court Doc. No. 42-3, Deposition of June Parham ("Parham Dep."); Court Doc. No. 42-4, Affidavit of June Parham ("Parham Aff.")]. Former Chief Parham states in her affidavit filed in support of Etowah's motion that:

> During the time I was Chief of Police, Etowah's official policies did not condone or encourage the violation of constitutional rights.
> The Etowah Police Department does not have a history of unconstitutional searches, detainments, or arrests.
> Etowah requires all of its police officers to complete an eight (8) week training course at the Tennessee Law Enforcement Academy in Donelson, Tennessee, prior to becoming a police officer.
> Each of Etowah's police officers is required to attend forty (40) hours of additional training each year to remain certified.
> Both Officer Ervin and Officer Nelms completed their training and remained certified at all times relevant to this cause of action.
> . . . There is no provision in the *City Police Manual* which would authorize a

body cavity search of a female suspect by any Etowah police personnel, whether male or female.

Parham Aff., ¶¶ 3-9. The Etowah City Police Manual indicates that:

<u>Searches of persons</u>:
1.    <u>Permitted when</u>:
     a.    checking out a lawfully detained person to assure that he has no weapon by which he may harm the officer.
     b.    incidental to an arrest.
     c.    with a search warrant.
. . .
3.    <u>Search of women</u>:
     a.    Whenever possible, female police personnel will be used to search women suspects or prisoners.
     b.    When female police personnel are unavailable, male officers may make a cursory search of female prisoners for weapons. Such a search will be restricted to:
          i.    outer garments (coats, jacket, etc.).
          ii.    purse, handbag, sacks, etc.

Parham Aff., Ex. A, Part 13A. The Manual does not contain a provision for conducting strip searches or body cavity searches. Former Chief Parham further testified that the Etowah "standard procedure" was that "[w]hen officers, especially the male officers, if they dealt with a female, they were allowed to do a backhand search but not allowed to go into the cavity. Body cavities. That's been in effect through the academy and now." Parham Dep., p. 22. When asked whether she was familiar with when it was permissible for an officer to perform a body cavity search, Chief Parham answered, "[w]e didn't do them. We just did not do them." *Id.*

**II.**    **Standard of Review**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to

-5-

the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435-36. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 140 (6th Cir. 1997). If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it

may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

**III.     Analysis**

   *A.     Section 1983 Claim*

   Section 1983 states in pertinent part:

   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.  To establish a claim pursuant to Section 1983, plaintiffs must demonstrate two elements: "(1) the defendants deprived [plaintiffs] of a right, privilege, or immunity secured to [them] by the United States Constitution or other federal law; and (2) the defendants caused the deprivation while acting under color of state law." *Cunningham v. Sisk*, 2003 WL 23471541, *5 (E.D. Tenn. 2003) (citing *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000)).  Only the first prong of the test is relevant in this action because Etowah does not dispute that its officers were acting under color of state law while participating in the search of Plaintiff.

   Section 1983 " 'creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere.' " *Alexander v. Haymon*, 254 F.Supp.2d 820, 830 (S.D. Ohio 2003) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000)).  Plaintiff alleges that Etowah violated her Fourth and Fourteenth Amendment rights under the U.S. Constitution.  U.S. Const. amend. IV; U.S. Const. amend. XIV.

   The U.S. Supreme Court has held that municipalities are included as persons within the

meaning of Section 1983, and therefore plaintiffs may sue municipalities for relief under the statute. *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, a municipality may not be held liable under Section 1983 under a theory of respondeat superior. *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 691). Municipalities are only liable under Section 1983 if they have an established policy or custom that causes the alleged injury. *See Monell*, 436 U.S. at 690.

> A municipality may be held liable only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.' Furthermore, for municipal liability, there must be an 'affirmative link between the policy and the particular constitutional violation alleged.' The claimant has the burden of proof for establishing the existence of an unconstitutional policy and demonstrating the link between the policy and the alleged injuries at issue.

*Bennett*, 410 F.3d at 818-19 (quotations and citations omitted). Plaintiffs must prove that their particular injuries were "incurred because of the execution of the policy or custom." *Cunningham*, 2003 WL 23471541 at *14 (citing *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405 (1997); *Gregory*, 220 F.3d at 442; *Doe v. Claiborne County, Tennessee*, 103 F.3d 495 (6th Cir. 1996)).

> To establish municipal liability, a plaintiff must:
>
> (1) identify a municipal policy; (2) establish that the municipality is responsible for promulgating the policy; and (3) show that execution of the policy caused the injury of which the plaintiff has complained.

*Hilliard v. Walker's Party Store, Inc.*, 903 F.Supp. 1162, 1178-79 (E.D. Mich. 1995).

This court has noted that a custom must " 'be so permanent and well settled as to constitute a custom or usage with the force of law.' " *Cunningham*, 2003 WL 23471541 at *14 (quoting *Monell*, 436 U.S. at 691). A plaintiff may establish a policy or custom in several ways.

-8-

There may be an official policy that defendant promulgated. *Id.* Plaintiffs may also show a "pervasive custom or practice of which the [ ] lawmakers either know or reasonably should know." *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)); *see also*, *Hilliard*, 903 F.Supp. at 1179. Such a custom must be "so widespread and commonly accepted as to in effect have the force of law." *Cunningham*, 2003 WL 23471541 at *14 (citing *Brown*, 520 U.S. at 404; *Monell*, 436 U.S. at 690-91). Plaintiffs can also establish the requisite policy or custom for purposes of Section 1983 by demonstrating that an official with policymaking authority has taken a single act relating to the subject matter or area at issue. *Cunningham*, 2003 WL 23471541 at *14 (citing *City of St. Louis v. Paprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cinncinnati*, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

Plaintiff presents no evidence of any policy or custom, either official or unofficial, on the part of the City of Etowah relating to the alleged strip search of Ms. Whitsett. The City of Etowah presents evidence that it has no policies in place encouraging such violations and that it has policies in effect to prevent violations of constitutional rights. Parham Aff., ¶ 4; Parham Aff., Ex. A. It is plaintiff's burden to produce evidence of a policy, an injury, and a link between the policy and the injury. *See Bennett*, 410 F.3d at 818-19. Plaintiff fails to establish evidence of the requisite policy.

Plaintiff could also demonstrate liability under Section 1983 against the City of Etowah by showing that the city failed properly to train and supervise its employees. *Cunningham*, 2003 WL 23471541 at *15; *Hilliard*, 903 F.Supp. at 1180. Liability under this theory will exist only if Plaintiff "can prove that the [governmental agencies'] failure to train evidences deliberate

-9-

indifference to the rights of its inhabitants such that the failure to train in effect constitutes a governmental custom or policy within the *Monell* framework." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *see also, Hilliard*, 903 F.Supp. at 1180 (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 123-24, 112 S.Ct. 1061 (1992)). To demonstrate liability for failure to train, the plaintiff must demonstrate that: "(1) the training program is inadequate to the tasks that the municipal actor must perform; (2) the inadequacy is the result of the municipality's deliberate indifference; and (3) the inadequacy caused the plaintiff's constitutional injury." *Hilliard*, 903 F.Supp. at 1180 (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1346 (6th Cir. 1994)). Further,

> [i]n a failure to train case, the focus must be upon the 'adequacy of the training program in relation to the tasks the particular officers must perform.' It is not enough to establish that a particular officer was inadequately trained, or that there was negligent administration of an otherwise adequate program, or that the conduct resulting in the injury could have been avoided by more or better training. The plaintiff must identify a specific deficiency which is the actual cause of the constitutional deprivation.

*Hilliard*, 903 F.Supp. at 1180 (citing *City of Canton*, 489 U.S. at 390-91). Deliberate indifference can be established in certain cases in which:

> it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Berry*, 25 F.3d at 1346 (quoting *City of Canton,* 489 U.S. at 390). Evidence pertinent to a claim of deliberate indifference might be a failure to discipline including a "showing of a history of widespread abuse that has been ignored" by the municipality. *See Berry*, 25 F.3d at 1354. In

*Berry* the Sixth Circuit addressed liability in the context of a failure to train issue. *Id.* In determining that the evidence in *Berry* did not support a failure to train claim, the Sixth Circuit cited evidence used to support such a claim in other cases. *Id.* at 1355. For instance, the *Berry* court cited *Spell v. McDaniel*, a Fourth Circuit case in which the plaintiff demonstrated repeated, widespread use of excessive force in the defendant police department. 824 F.2d 1380, 1392-93 (4th Cir. 1987). In Spell the plaintiff used the testimony of citizens who had been subjected to acts of police brutality, as well as testimony from eight present or former police officers in the police department detailing past examples of police brutality that had not been disciplined. 824 F.2d at 1392-93.

> As the Sixth Circuit recently noted:
>
> The inadequacy of police training only serves as a basis for § 1983 liability "where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *Harris*, 489 U.S. at 388 (emphasis added). "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *St. John v. Hickey*, 411 F.3d 762, 776 (6th Cir. 2005) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)) . . .

*Slusher v. Carson*, __ F.3d __, 2008 WL 4006687 *6 (6th Cir. 2008).

It is clear that searches as invasive as strip searches and/or body cavity searches may only be performed in certain narrow, limited circumstances. For instance, in *Timberlake* the district court noted that:

> [t]here is no doubt that strip searches are permissible under certain circumstances. The propriety of strip searches has been almost exclusively addressed in the context of arrestees, detainees, inmates, and persons crossing international borders. Strip searches of prison employees and visitors have also been discussed in case law. In all of these instances, the courts have balanced the privacy interests of the individual with the state's legitimate interest in preserving

-11-

Case 1:07-cv-00117  Document 46  Filed 09/30/08  Page 11 of 16  PageID #: 302

> evidence and interdicting contraband, smuggling, and weapons. In these cases the individuals searched had a decreased expectation of privacy due to the circumstances underlying the incidents. Thus, arrestees, detainees, and prisoners have already had their liberty and privacy compromised. . . . In all of these instances, courts have found special circumstances warranting strip searches.

*Timberlake*, 786 F.Supp. at 690.

As the court found in *Timberlake*, a "private citizen legally travelling on a public highway" does not present "special circumstances" warranting the invasive, humiliating practice of a strip search. 786 F.Supp. at 690-91. In *Timberlake* the district court noted that "to conduct an involuntary noncustodial strip search of a person, when there is no decreased expectation of privacy, requires both probable cause and especially exigent circumstances." *Id.* at 691 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 382 n. 25, 105 S.Ct. 733, 764 n. 25 (1985)). Even in the limited circumstances in which a strip search is warranted, they should be conducted "in a private manner, only upon a showing of reasonable suspicion." *Id.* Tennessee also has specific laws pertaining to the method of performing strip searches and/or body cavity searches. *See* Tenn. Code Ann. §§ 40-7-119, 40-7-121. Tennessee law outlines procedures for conducting a strip search of an *arrested* individual:

> (a) As used in this section, "strip search" means having an arrested person remove or arrange some or all of the person's clothing so as to permit a visual inspection of the genitals, buttocks, anus, female breasts or undergarments of the arrested person.
> (b) No person arrested for a traffic, regulatory or misdemeanor offense, except in cases involving weapons or a controlled substance, shall be strip searched unless there is a reasonable belief that the individual is concealing a weapon, a controlled substance or other contraband.

Tenn. Code Ann. § 40-7-119. Further, under Tennessee law, "[n]o person shall be subjected to a body cavity search by a law enforcement officer or by another person acting under the direction, supervision or authority of a law enforcement officer unless the search is conducted pursuant to a

-12-

search warrant issued in accordance with Rule 41 of the Tennessee Rules of Criminal Procedure." Tenn. Code Ann. § 40-7-121(b). In addition, a person does not consent to a body cavity search unless that individual has signed a consent form containing explicit provisions in accordance with Tennessee law. Tenn. Code Ann. § 40-7-121(c).

In this action, the lack of policies relating to strip searches or body cavity searches might indicate that officers were not trained regarding the parameters or circumstances under which such searches could be performed. However, the Etowah policy pertaining to searches of arrested individuals suggests that body cavity and/or strip searches may not ever be performed. In addition, Plaintiff has presented no evidence that there was a policy, practice, or widespread instances of abusive strip searches and/or body cavity searches. In fact, there is no evidence of any other instances of any strip searches or body cavity searches performed by Etowah police officers. Thus, the facts in this case contrast with other cases finding liability on the basis of a failure to train officers. As the Third Circuit has noted, failure to "train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations." *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). *See Spell*, 824 F.2d 1392-93; *Slusher*, 2008 WL 4006687 at *6. In this case Plaintiff presents no evidence of a pattern of violations or practice of illegal strip searches and/or body cavity searches. Therefore, she cannot demonstrate municipal liability based on either a policy or custom or on the basis of the City of Etowah's failure to train. For these reasons, this court will GRANT Etowah's motion for summary judgment.

    *D.    State Law Claims*

Plaintiff also brings claims against the City of Etowah for intentional infliction of

emotional distress or negligent infliction of emotional distress. The City requests that this Court decline to exercise supplemental jurisdiction over the state law claims in the instant action. Etowah argues that under the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. §§ 29-20-101 et seq. ("TGTLA"), Tennessee state courts retain exclusive jurisdiction over claims arising under the TGTLA. Tennessee Code Annotated § 29-20-307 provides that "[t]he circuit courts shall have exclusive original jurisdiction over any action brought under this chapter and shall hear and decide such suits without the intervention of a jury . . ." The TGTLA requires that all claims must be brought in "strict compliance" with the Act. Tenn. Code Ann. § 29-20-201(c). The Act provides that "[e]xcept as may be otherwise provided in this chapter, all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201(a). The TGTLA removes immunity for negligent actions of employees unless such actions were related to discretionary functions or certain enumerated intentional torts. Tenn. Code Ann. § 29-20-205.

In *Beddingfield v. City of Pulaski, Tennessee* the district court declined to exercise jurisdiction over pendent state law claims of wrongful death and violation of the Tennessee Constitution "in the face of the limitations upon suability specified in Tenn. Code Ann. § 39-20-307." 666 F.Supp. 1064-66 (M.D. Tenn.), *rev'd on other grounds*, 861 F.2d 968 (6th Cir. 1988). 28 U.S.C. § 1367(c) provides that "district courts may decline to exercise supplemental jurisdiction over a claim . . . . if – . . . (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons

-14-

for declining jurisdiction." 28 U.S.C. § 1367(c). The Sixth Circuit has determined that "the Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts. This unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining jurisdiction." *Gregory*, 220 F.3d at 446.

In *Gregory*, the Sixth Circuit affirmed the magistrate judge's dismissal of the state law claims against a law enforcement officer acting in his official capacity. 220 F.3d at 446. Similarly, in *Maxwell v. Conn* the Sixth Circuit affirmed the district court's decision to dismiss the plaintiff's pendent state law claims against defendant sheriff department employees without prejudice based on the exclusivity provision in the TGTLA. 893 F.2d 1335, 1990 WL 2774 *3-4 (6th Cir. 1990). *See also, Millender v. Bowman*, 2004 WL 2238526 *3 (W.D. Tenn. 2004); *Spurlock v. Whitney*, 971 F.Supp. 1166, 1185 (M.D. Tenn. 1997); *Timberlake v. Benton*, 786 F.Supp. 676, 696 (1992).

In some cases district courts have declined to adhere to the exclusive jurisdiction provision of the TGTLA due to federal jurisdiction existing on the basis of diversity of citizenship. *See e.g.*, *Metaljan v. Memphis-Shelby County Airport Authority*, 752 F.Supp. 834, 836-37 (W.D. Tenn. 1990). However, in the instant action, the Plaintiff has not shown that this Court's jurisdiction over the state law claims is based on diversity of citizenship. Because this court has dismissed the Section 1983 claim against the City of Etowah, it will decline to exercise supplemental jurisdiction over Plaintiff's infliction of emotional distress claims against the City. Therefore, this Court will **DISMISS WITHOUT PREJUDICE** the Plaintiffs' state law claims against the City of Etowah.

**IV.    Conclusion**

As discussed *supra*, Plaintiff's Section 1983 claim against the City of Etowah will be DISMISSED with prejudice.  Plaintiff's state law claims against the City of Etowah will be DISMISSED without prejudice.

A separate order will enter.


        */s/ R. Allan Edgar*
        R. ALLAN EDGAR
   UNITED STATES DISTRICT JUDGE

-16-

Case 1:07-cv-00117   Document 46   Filed 09/30/08   Page 16 of 16   PageID #: 307